UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KHOSLA VENTURES, LLC,

    Plaintiff,

v.

ROLLS-ROYCE CANADA LIMITED,

    Defendant.

Civ. No. 11-07529

OPINION

THOMPSON, U.S.D.J.

This matter is pending before the Court upon the motion of Defendant Rolls-Royce Canada Limited ("RRC") to dismiss Counts II and III of Plaintiff Khosla Ventures, LLC's ("Khosla's") First Amended Complaint. (Doc. No. 44). Khosla opposes. (Doc. No. 45). The Court has decided the motion based upon the written submissions of the parties and without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the reasons included herein, the Court denies RRC's motion.

BACKGROUND

The underlying facts in this matter arise from a contractual agreement between Khosla and RRC, whereby RRC agreed to perform maintenance and repair work on aircraft engines owned and operated by Khosla.[1] On December 27, 2011, Khosla filed a complaint against RRC, alleging breach of contract and negligent misrepresentation. (Doc. No. 1). RRC moved to dismiss the negligent misrepresentation claim, (Doc. No. 10), and the Court granted the motion,

---

[1] Khosla is a Delaware corporation with its principal place of business California. (Doc. No. 41, Amd. Compl., ¶ 4). RRC is a Canadian corporation registered to do business in New Jersey, and has designated and registered an agent in New Jersey. (Doc. No. 41, ¶ 5). Jurisdiction is proper under 28 U.S.C. § 1332(a)(2), and venue is proper under 28 U.S.C. § 1391(d).

(Doc. No. 20).  Khosla was then permitted to file an amended complaint ("Amended Complaint"), (Doc. No. 41, Amd. Compl.), the relevant facts of which are recited below.

Khosla is the owner of a GV jet Aircraft, Serial No. 513 ("the Aircraft").  (Doc. No. 41, Amd. Compl., ¶ 8).  The Aircraft has two model BR710 engines, Engine 11128 and Engine 11129.  (Doc. No. 41, Amd. Compl., ¶ 8).  In the course of refurbishment and maintenance work, the contracting party failed to properly preserve the engines in the manner required by the engine specifications of Rolls-Royce Deutschland Ltd. & Co. ("RRD") – RRC's sister company.  (Doc. No. 41, Amd. Compl., ¶ 10).  RRD denied the request for a technical variance so that the Aircraft could remain in service, and required a "shop assessment" to identify any possible damage. (Doc. No. 41, Amd. Compl., ¶10).

Khosla contracted with RRC, the only facility in North America capable of performing RRD's required shop assessment.  (Doc. No. 41, Amd. Compl., ¶¶ 11-12).  RRC estimated that the assessment of one of the engines, Engine 11129, would cost approximately $491,984, and would be completed by March 30, 2011.  (Doc. No. 41, Amd. Compl., ¶¶ 11-12).

On or about February 14, 2012, RRC inspected two integral components of Engine 11129 – the HPTI and the HPT2 discs – and secured abnormal measurements.  (Doc. No. 41, Amd. Compl., ¶¶ 13-15).  Because the measurements were beyond the acceptable deviation from the original diameter allowed for in the Rolls-Royce Engine Manual, RRC sent RRD engineers the measurements and an application for a "technical variance" to permit continued service of the discs despite the readings.  (Doc. No. 41, Amd. Compl., ¶ 15).  RRD, in response, rejected the technical variance with respect to HPT1, and questioned the measurements of HPT2 – suggesting to RRC that it may have been mismeasured.  (Doc. No. 41, Amd. Compl., ¶¶ 17-18).

About a week after RRD rejected the technical variance for the HPT1 disc, RRD

informed RRC that it wanted to inspect Engine 11129 for an engine design issue that could potentially affect over forty engines in service. (Doc. No. 41, Amd. Compl., ¶ 19). RRD placed one of its engineers on the investigation and requested that RRC provide a number of additional measurements on various components of Engine 11129. (Doc. No. 41, Amd. Compl., ¶¶ 19-20).

Thereafter, RRD requested on numerous occasions that certain parts from Engine 11129 be sent to its location in Germany, and further decided to extend the investigation from the discs to the High Pressure Compressor ("HPC"), where RRD suspected a design flaw was causing the anomalous measurements. (Doc. No. 41, Amd. Compl., ¶ 21). Khosla emphasizes that only weeks earlier, RRD had issued a technical variance accepting the condition of the HPC on Engine 11129 as fully functional. (Doc. No. 41, Amd. Compl., ¶ 22).

As Khosla was a "time-and-material" customer with RRC, only work authorized by Khosla could be conducted on Engine 11129 beyond the original work scope. (Doc. No. 41, Amd. Compl., ¶¶ 21-22). However, Khosla was never informed of RRD's desire to discreetly conduct an investigation into its engine design. (Doc. No. 41, Amd. Compl., ¶¶ 21, 36). Instead, Khosla asserts that, on or about April 8, 2011, RRC and RRD began working together to develop a report to justify an extended work scope and to compel Khosla to allow RRD, without Khosla's knowledge, to inspect the HPC without exposing any Rolls-Royce entity to liability on the BR710 design issue. (Doc. No. 41, Amd. Compl., ¶ 23).

On or about April 11, 2011, and again in an April 14 teleconference at which RRD was present, RRC informed Khosla that it was recommending converting the shop assessment of Engine 11129 into a full mid-life inspection. (Doc. No. 41, Amd. Compl., ¶¶ 24-25). RRC cited as justification the abnormal measurements and necessary replacement of HPT1 and HPT2, which would in turn require an expensive modification of the HPC. (Doc. No. 41, Amd. Compl.,

3

¶¶ 24-25). Because a full mid-life inspection involves a strip of the HPC, Khosla's authorization would provide RRD with the access necessary for its discreet investigation. (Doc. No. 41, Amd. Compl., ¶ 24). Khosla asserts that based upon mutual decision, neither RRC nor RRD communicated the possibility that HPT2 had been mismeasured and might not need replacement, thereby removing the justification for a mid-life inspection. (Doc. No. 41, Amd. Compl., ¶ 25).

Based upon the advice and representations of RRC, Khosla authorized the mid-life inspection on April 23, 2011, and Engine 11129 was taken in by RRC on May 5. (Doc. No. 41, Amd. Compl., ¶¶ 26-27). Without Khosla's knowledge or consent, RRC arranged for RRD's engineer to visit the RRC facility on May 10, 2011 to conduct an on-site investigation into the potential BR710 design issues. (Doc. No. 41, Amd. Compl., ¶ 27). On May 9, 2011, Khosla discovered that an RRD representative was on-site and promptly informed RRC via email of its refusal to authorize RRD to view or examine any of Engine 11129's parts. (Doc. No. 41, Amd. Compl., ¶ 28). In response, RRD directed RRC to "ensure that neither this engine, [nor] any parts from it, [be] released from RRC as serviceable unless we have concluded the safety investigation confirming that we have no outstanding concerns regarding these parts." (Doc. No. 41, Amd. Compl., ¶ 29). Khosla asserts that communication of this refusal led it to acquiesce to the investigation on May 11, 2011, in order to minimize further delays and ensure that Engine 11129 would eventually be released as serviceable. (Doc. No. 41, Amd. Compl., ¶¶ 29, 32).

However, on May 10, 2011, a day before Khosla's authorization and only five days after Engine 11129 was interned for its inspection, an RRD representative arrived at the RRC facility and conducted an extensive, day-long investigation into the HPT2 disc. (Doc. No. 41, Amd. Compl., ¶ 30). The investigation revealed the HPT2 disc had in fact been improperly measured. (Doc. No. 41, Amd. Compl., ¶ 30). Neither RRC nor RRD informed Khosla of this finding, and

4

the mid-life inspection continued.  (Doc. No. 41, Amd. Compl., ¶ 32).

When the mid-life inspection was complete, RRD issued an "Investigation Conclusion," detailing its findings that the HPTI disc had been damaged as a result of issues with Engine 11129's original design and manufacturing, and that the HPT2 disc had been mismeasured, and had not needed to be replaced.  (Doc. No. 41, Amd. Compl., ¶ 33).  After reviewing the report, Khosla signed RRC's Standard Terms and Conditions.  (Doc. No. 41, ¶ 39; Doc. No. 1, Exs. 1, 7).  When signing, Khosla stated: "[a]s previously discussed[,] Khosla Ventures d[i]sputes the amount to be claimed due for the repair or Engine 11129."  (Doc. No. 1, Ex. 7).

Now, based on the above facts, Khosla has asserted three causes of action: (1) breach of contract; (2) fraudulent inducement; and (3) civil conspiracy to commit fraud.  (Doc. No. 41, Amd. Compl., ¶¶ 38-55).  Khosla has further asserted various damages and injuries suffered as the result of RRC's actions, including (1) money spent on an unnecessary mid-life inspection and work related to the discs; (2) premature performance of the mid-life inspection, which caused Khosla to forfeit over 1,600 flight hours of use on Engine 11129; (3) a loss in value in the engine and the Aircraft as a result of the inspection; (4) opportunity costs in spending approximately $1 million – the cost of the mid-life – before it was necessary; and (5) lost time using Engine 11129 and the Aircraft.  (Doc. No. 41, Amd. Compl., ¶ 37).  RRC has moved to dismiss Counts II and III, fraudulent inducement and conspiracy to commit fraud.  (Doc. No. 44).  Khosla opposes, (Doc. No. 45), and the Court now decides.

## DISCUSSION

1. **Legal Standard**

On a Rule 12(b)(6) motion to dismiss for failure to state a claim, a "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  When considering such motion, the Court must first "take note of the

5

elements a plaintiff must plead to state a claim." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). The Court must also accept as true all of a plaintiff's well-pleaded factual allegations, disregarding any conclusory allegations, and must construe the complaint in the light most favorable to the plaintiff. *Fowler*, 578 F.3d at 210-11. Finally, the Court must determine whether the "facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). This requires more than a mere allegation of an entitlement to relief. *Id.* "A complaint has to 'show' such an entitlement with its facts." *Id.* A claim is only plausible if the facts pleaded allow a court reasonably to infer that the defendant is liable for the misconduct alleged. *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). Facts suggesting the "mere possibility of misconduct" fail to show that the plaintiff is entitled to relief. *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).

**2. Analysis**

The Court will first consider RRC's motion to dismiss with respect to the claim of fraudulent inducement, before turning to the claim of civil conspiracy to commit fraud.

A. <u>Count II – Fraudulent Inducement</u>

To sustain a claim of fraudulent inducement, Khosla must demonstrate that RRC, with the intent to deceive, knowingly misrepresented a present material fact to induce Khosla to act, resulting in damage to Khosla. *GoSmile, Inc. v. Levine*, 81 A.D.3d 77, 81 (N.Y. App. Div. 2010)); *Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667 (S.D.N.Y. 2009); *Braddock v. Braddock*, 60 A.D.3d 84, 86 (N.Y. App. Div. 2009). Here, the Court finds that Khosla has met this burden. Khosla has alleged facts that RRC intended to deceive Khosla so that Khosla would authorize a mid-life inspection, unknowingly providing RRD access to Engine 11129 for discreet engine testing. Khosla further alleges that when RRC informed Khosla that it would be in

6

Khosla's best interests to authorize a mid-life inspection, RRC concealed the fact that RRD suspected that HPT2 had been mismeasured, and knowingly misrepresented to Khosla that HPT2 was damaged. RRC also concealed, for a time, RRD's work and involvement on the engine. Khosla then acted upon RRC's recommendation, authorized a full mid-life inspection, and suffered damages as restated in the Background of this Opinion. Thus, Khosla has adequately supported its claim of fraudulent inducement.

The Court finds RRC's arguments to the contrary unavailing. RRC devotes a significant portion of its moving papers to the implications of Khosla's decision to sign RRC's Standard Terms and Conditions ("STC") even after Khosla learned from the Investigation Report that HPT2 was undamaged. RRC argues that because Khosla signed the STC after learning the *facts* of the fraud, Khosla knowingly and willingly released any fraud claim based thereon. Any late-breaking revelation as to the "why" of the fraud – in this case, RRC's desire to grant RRD access to Engine 11129 for separate testing – is, according to RRC, irrelevant.

However, at this stage of the litigation, what Khosla knew or did not know at the time it entered into the initial agreement to authorize the mid-life inspection, and what Khosla did or did not know at the time it signed the STC, are questions of fact. As Khosla emphasizes in its opposition brief, courts are hesitant to dismiss complaints at the initial stages of pleading based upon affirmative defenses. *See, e.g.*, *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) ("Generally speaking, we will not rely on an affirmative defense . . . to trigger dismissal of a complaint under Rule 12(b)(6)." (internal citations omitted)). Here, the Court does not find that the facts as alleged in the Amended Complaint are sufficient to show that Khosla was adequately informed upon agreeing to the work and upon signing the STC so as to waive any claim of fraud;

that Khosla later discovered previously unknown evidence of intentional fraud, as opposed to mere mistake, is not, in the Court's view, irrelevant.

The Court is likewise unprepared to hold that the exculpatory provisions in the STC should preclude Khosla's claim of fraudulent inducement. Under New York law, enforcement of an exculpatory provision will not apply to misconduct that "smacks of intentional wrongdoing, where it is willful, 'as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith.'" *Banc of America Securities LLC v. Solow Bldg. Co. II, L.L.C.*, 47 A.D.3d 239, 244 (N.Y. App. Div. 2007) (quoting *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (N.Y. App. Div. 1983)) (internal citations omitted). Fraudulent inducement appears to fall comfortably within the relevant sphere of intentional wrongdoing that would escape automatic waiver via exculpatory clause. Although RRC attempts to argue that Khosla's signing of the STC, after knowledge of the misrepresentation with respect to the measurements of HPT2, gives the exculpatory provisions power they would not otherwise have, the Court will not, at this stage of the litigation, lightly dismiss those claims. The Court, therefore, denies RRC's motion to dismiss with respect to Count II.

B. Count III – Civil Conspiracy

To maintain a claim of civil conspiracy, a "plaintiff must demonstrate [an] underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Fisk v. Letterman*, 424 F. Supp. 2d 670, 677 (S.D.N.Y. 2006) (quoting *Treppel v. Biovail Corp.*, No. 03 Civ. 3002, 2004 WL 2339759, at *19 (S.D.N.Y. Oct. 15, 2004)). RRC argues that Count III, civil conspiracy to commit fraud, should be dismissed because it is derivative of the fraudulent inducement claim

and cannot survive independently. *See Hoeffner v. Orrick, Herrinton & Sutcliff LLP*, 85 A.D.3d 457, 458 (N.Y. App. Div. 2011) ("civil conspiracy is not an independent tort"); *Fisk*, 424 F. Supp. 2d at 677 (S.D.N.Y. 2006) ("New York law only recognizes an action for civil conspiracy if it is connected to a separate underlying tort.") (citations omitted).

However, here, the claim for fraudulent inducement survives. Moreover, Khosla appears to have sufficiently pleaded facts to support the remaining four elements of a civil conspiracy claim: (1) the agreement between RRC and RRD to conceal information regarding the measurement of the HPT2 disc and the possibility that the engine model possessed a potential design defect; (2) RRC's recommendation to Khosla that the HPT2 disc be replaced and that Khosla should authorize a mid-life inspection; (3) the intentional participation of RRC and RRD to further the concealment; and (4) the resulting damage/injury to Khosla in terms of opportunity costs, lost flight time, depreciation in the engine value, and so on. Finally, the Court will, for the reasons stated above, not apply the STC exculpatory provisions to the claim of civil conspiracy at this time. The Court, therefore, denies RRC's motion to dismiss Count III of the Amended Complaint.

## CONCLUSION

For the foregoing reasons, the Court denies RRC's motion to dismiss. (Doc. No. 44). An appropriate Order accompanies this Opinion.

/s/Anne E. Thompson
ANNE E. THOMPSON, U.S.D.J.

Dated: <u>August 22, 2013</u>